**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JBF INTERLUDE 2009 LTD., | |
| Plaintiff, | |
| v. | C.A. No. 25-1553-JLH |
| ARTISAN TECHNOLOGIES LLC, | |
| Defendant. | |

**PLAINTIFF JBF INTERLUDE 2009 LTD.'S RESPONSE**
**TO ARTISAN'S MOTION TO DISMISS**

# TABLE OF CONTENTS

I.    **NATURE AND STAGE OF THE PROCEEDINGS** ........................................................ 1

II.    **SUMMARY OF ARGUMENTS** ............................................................................. 1

III.    **STATEMENT OF FACTS** ..................................................................................... 2

    A.  **U.S. Patent No. 9,641,898** ............................................................................. 2

    B.  **US Patent No. 12,450,306** ............................................................................. 5

IV.    **ARGUMENT** ............................................................................................... 9

    A.  **U.S. Patent No. 9,641,898 Is Directed To Patentable Subject Matter** ........................... 9

        1.  *Alice/Mayo* Step One: The '898 Patent Is Directed To A Video Player Implementation Using Specific Data Structures ........................................................... 10

        2.  *Alice/Mayo* Step Two: The Non-conclusory Allegations of the Complaint Establish That '898 Patent Contains An Inventive Concept ...................................... 13

    B.  **U.S. Patent No. 12,450,306 Is Directed To Patentable Subject Matter** ...................... 14

        1.  *Alice/Mayo* Step One: The '306 Patent Is Directed To A Video Player Implementation Using A Specific Software Architecture ......................................... 15

        2.  *Alice/Mayo* Step Two: The Non-conclusory Allegations of the Complaint Establish That '306 Patent Contains An Inventive Concept ...................................... 17

    C.  **The Complaint Provides Sufficient Notice of Infringement For Both Patents** ........... 18

    D.  **The Complaint Plausibly Pleads Pre-Suit Knowledge of Infringement** ...................... 19

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018) ...................................................................................... 14

*Adasa Inc. v. Avery Dennison Corp.*,
  55 F.4th 900 (Fed. Cir. 2022) ....................................................................................... 11

*Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*,
  No. 2022-2215, 2024 WL 1338940 (Fed. Cir. Mar. 29, 2024)...................................... 13

*Bot M8 LLC v. Sony Corp. of Am.*,
  4 F.4th 1342 (Fed. Cir. 2021) .................................................................................... 1, 18

*Contour IP Holding LLC v. GoPro, Inc.*,
  113 F.4th 1373 (Fed. Cir. 2024) ............................................................................... 10, 15

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ................................................................................ 12, 17

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*,
  888 F.3d 1256 (Fed. Cir. 2018) ..................................................................................... 18

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ..................................................................................... 11

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011)................................................................................................... 2, 19

*Innovaport LLC v. Target Corp.*,
  No. 2024-1545, 2026 WL 321266 (Fed. Cir. Feb. 6, 2026) ....................................... 17

*Robocast, Inc. v. Netflix, Inc.*,
  767 F. Supp. 3d 138 (D. Del. 2025)............................................................................... 13

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ..................................................................................... 12

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
  930 F.3d 1295 (Fed. Cir. 2019) ..................................................................................... 11

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ............................................................................... 10, 11

*Uniloc USA, Inc. v. ADP, LLC*,
   772 F. App'x 890 (Fed. Cir. 2019).......................................................................... 12

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020) ............................................................................ 11

*Weisner v. Google LLC*,
   51 F.4th 1073 (Fed. Cir. 2022) ............................................................................. 14

**All emphasis appearing in this brief is added unless otherwise indicated.**

**LISTING OF SELECTED CLAIMS**

Numbers in brackets below have been added to identify claim limitations.  Coloring has been added to show key elements and their relationships across limitations.

**U.S Patent No. 9,641,898**

1. A system comprising:

[1] a video player programmed to perform operations comprising:

[2] presenting a video stream to a user for viewing by the user, **the video stream comprising a predefined path of prerecorded video segments**;

[3] during presentation of the video stream:

[4] displaying, to the user viewing the video stream, at least **a portion of a library of selectable prerecorded video segments**;

[5] receiving, from the user viewing the video stream, a selection relating to **one or more of the prerecorded video segments from the library**;

[6] adding, based on the selection, **the one or more prerecorded video segments** to **a video segment watch-list**;

[7] identifying **a decision point in the predefined path**, the decision point comprising a location at which the video stream can transition to one of **a next prerecorded video segment in the predefined path** and **a segment in the video segment watch-list**; and

[8] inserting at **least one segment from the watch-list** into **the video stream at the decision point**, wherein **the at least one inserted segment** comprises the one or more prerecorded video segments that were added to the watch-list based on the selection received from the user viewing the video stream; and

[9] presenting, to the user viewing the video stream, **the at least one inserted segment** as part of the video stream; and

[10] continuing presentation of **the predefined path of prerecorded video segments** after the presentation of **the at least one inserted segment**.

**U.S Patent No. 12,450,306**

1. A method for presenting an interactive video to a user, the method comprising:

[1] providing a product webpage associated with a product;

[2] displaying, via the product webpage, **an application layer including a plurality of user interface (UI) elements**, wherein each UI element corresponds to a different configurable feature of the product;

[3] displaying, via the product webpage, **a video player layer** integrated in **the application layer** and **configured to present the interactive video** to the user, the interactive video representing the product;

[4] receiving, via a **first UI element of the plurality of UI elements**, a first user interaction indicating a selection of a first feature option from a plurality of first feature options for a first configurable feature of the product;

[5] sending at least **one first message** from **the application layer** to **the video player layer** in response to the first user interaction;

[6] presenting, via **the video player layer**, first video content of the interactive video based on the at least **one first message**, wherein the first video content includes a user-specific product configuration having the first feature configured with the first feature option;

[7] during presentation of the first video content, receiving, via a **second UI element of the plurality of UI elements**, a second user interaction indicating a selection of a second feature option from a plurality of second feature options for a second configurable feature of the product;

[8] sending at least **one second message** from **the application layer** to **the video player layer** in response to the second user interaction; and

[9] transitioning from the first video content to second video content of **the interactive video** based on the at least **one second message**, wherein the second video content includes a user-specific product configuration having the first feature configured with the first feature option and the second feature configured with the second feature option.

I.      **NATURE AND STAGE OF THE PROCEEDINGS**

Plaintiff JBF Interlude 2009 Ltd. (which does business as, and will hereinafter be referred to as, "Eko") filed the present lawsuit alleging infringement of U.S. Patent Nos. 9,641,898 and 12,450,306 on December 23, 2025.  Defendant Artisan Technologies LLC ("Artisan") filed the present motion to dismiss on February 12, 2026 (ECF No. 12).

II.     **SUMMARY OF ARGUMENTS**

1.      The '898 Patent claims patentable, non-abstract subject matter.  The claims are patentable at *Alice/Mayo* Step One because they are directed to an implementation of a video player that organizes and displays content using specific data structures and software components, not to any abstract operation that can be performed in the human mind.  Moreover, even if abstract, the claims survive at *Alice/Mayo* Step Two because the patent and complaint make concrete, non-conclusory allegations demonstrating that the manner in which the claimed video player system operates is a novel and unconventional solution to a specific problem arising in computer networks.

2.      The '306 Patent claims patentable, non-abstract subject matter.  The claims are patentable at Step One of the *Alice/Mayo* test because they are directed to a specific software architecture that allows straightforward integration of interactive video in a retailer's product sales pages, using a message-passing interface to provide dynamic updates.  Moreover, even if abstract, the claims survive at *Alice/Mayo* Step Two because the patent demonstrates that the claimed message-passing architecture is non-conventional, and provides specific benefits over the prior art.

3.      The Complaint sufficiently pleads infringement of the two patents-in-suit, as it need only provide "place the alleged infringer on notice of what activity is being accused of infringement," rather than "plead infringement on an element-by-element basis." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021) (cleaned up).  The Complaint provides detailed charts that identify the particular Artisan interactive video functionality accused of

1

infringement, and how each element is met.

4.    The Complaint sufficiently pleads Artisan's pre-suit knowledge of the patent.  The Complaint alleges that Artisan worked with Eko on the patented technology for years, and after that relationship ended, copied Eko's patented technology for its own products.  At a minimum, Artisan was willfully blind to the fact that the novel technology it copied was covered by a patent, which suffices.  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 768 (2011).

### III.    STATEMENT OF FACTS

#### A.    U.S. Patent No. 9,641,898

The '898 Patent is titled "Methods and Systems for In-video Library," and is directed to dynamic video playback, more specifically "methods and systems for presenting a seamless video stream based on user selections of video segments from an in-video library that is maintained in real-time." '898 Patent at 1:6-10. The patent acknowledges the well-known fact that as of the time of invention—as today—the proliferation of video streaming services leads to a substantial body of video clips (or "video segments") available to the viewer, spanning a plethora of interests and activities through which a viewer must search for relevant content. *Id.* at 1:14-26.  Unlike the traditional patterns of watching video content, where a viewer would sit down for a one-hour television show or two-hour movie, in a typical viewing session on the modern Internet, a user may watch dozens of relatively short, independent video segments in sequence.  The '898 Patent recognizes that although the video display system should allow a viewer to manually select further video segments, there is also a need for the video display system to automatically select content that it deems relevant, in case the viewer makes no selection. *Id.* at 6:35-44, 11:62–12:6.

A shortcoming of video playback systems that existed at the time of invention in 2013 was the lack of "seamless" transitions between videos, "such that no noticeable or buffering occurs between the segments," (*id.* at 3:61-65), and without "noticeable gaps, jumps, freezes, or other

2

visual or audible interruptions to video or audio playback between segments," (*id.* at 11:32-38). That is, when a viewer watches a sequence of video segments on, *e.g.*, YouTube, it's clear that the segments weren't intended to fit together, unlike successive scenes in a TV show or movie.  For example, there may be a hard stop and a pause between successive videos in a playlist, or a hard cut when a second video is selected, and the video player may not revert back to the previously playing playlist after the second video concludes.  These shortcomings resulted in interrupted playback, rebuffering, or otherwise requiring the viewer to exit the video stream, which in turn resulted in decreased viewer engagement.  '898 Patent at 1:21-26; Compl. ¶15.

With that in mind, the inventors of the '898 Patent set out to develop a video playback system that allows for seamless viewing of separate video segments, and which allows for both user-driven and automatic selection.  As the '898 Patent explains, a "seamless" video stream (such as those enabled by its invention) should be "a continuous playback of content that gives the user the appearance of watching a single, linear multimedia presentation, as well as a continuous playback of multiple content segments that have smooth audio and/or video transitions (e.g., fadeout/fade-in, linking segments) between two or more of the segments." '898 Patent at 11:39-44. The '898 Patent describes a video player system that the inventors developed to address this problem.  The video player ensures that "the segments 120a-120d in the watch-list 130 can be played as a continuous video stream, such that no noticeable delay or buffering occurs between the segments … and no user interaction is required to continue playing subsequent segments," through use of "intelligent buffering and progressive downloading."  *Id.* at 3:61-67.

Unlike traditional video players, the video player of the '898 Patent is designed to allow "intelligent transitions between two or more segments."  *Id.* at 4:16-19. "For example, if the watch-list 130 contains a golf highlight video segment followed by a basketball highlight video segment,

the video player 100 can insert one or more audio and/or video transitions between the segments based on the preceding segment (golf), the subsequent segment (basketball), or both.  For instance, a video segment may be inserted in which a sports announcer says, 'And that's it for today's golf highlights—now, basketball.'" *Id.* at 4:19-26.  The novel video player of the '898 Patent also allows for interactivity while maintaining seamlessness; for example, when watching a music video, "the user [can be] presented with a choice as to who will sing the first verse of the song: a tall, female performer, or a short, male performer," and regardless of which choice is made (or indeed, if no choice is made and the default is selected), "a seamless transition occurs to the next segment, meaning that the audio and video continue on to the next segment as if there were no break between the two segments and the user cannot visually or audibly detect the transition."  *Id.* at 13:13-27.

The '898 Patent's video player achieves this seamlessness and interactivity through a novel data structure known as a "predefined seamless multimedia content path."   A content path is formed from "[t]wo or more combined segments," and "there can be multiple paths that a user can take to experience a complete, start-to-finish, seamless presentation." *Id.* at 12:25-29.  "There can be any number of predefined paths, each having any number of predefined multimedia segments." *Id.* at 12:34-36.  Importantly, because the paths are predefined, there are a "fixed set[] of possible transitions" between segments, allowing the content provider to "ensure seamless transitions among segments." *Id.* at 12:32-33.  For example, the transitions to the next segments can be downloaded in the background. *Id.* at 12:55-58.  The path can also define "decision points," logical points for transitions in the video stream (*e.g.*, the end of a sport highlight or a song verse), at which the video player may insert other video segments in a way that avoids a hard transition, and return to the predefined path once the inserted video segment has completed. *Id.* at 11:44-53.

The independent claims of the '898 Patent are directed to the interactive and seamless video

4

player implemented using predefined content paths.  The video player "present[s] … [a] video stream comprising a predefined path of prerecorded video segments" (limitation [2]), and "during [that] presentation," *i.e.*, simultaneously (limitation [3]), the video player "display[s] … a portion of a library of selectable prerecorded video segments" like that shown as item 150 in Figure 1 (limitation [4]).  The user can "select[] … video segments from the library" (limitation [5]), which are then "add[ed] … to a video segment watch-list" (limitation [6]).  The video player subsequently "identif[ies] a decision point in the predefined path," and at such point decides whether to "insert[] at least one segment from the watch list" (limitation [7]).  If a segment is inserted from the watch list, that segment is "present[ed] to the user" (limitation [9]), and then the video "continu[es] presentation of the predefined path" once the segment is complete (limitation [10]).

### B.    US Patent No. 12,450,306

The '306 Patent" is titled "Video Player Integration Within Websites," and is directed to "presenting interactive videos using an interactive video player integrated within websites." '306 Patent at 1:13-16.  The '306 Patent recognizes that retailers' sales websites, to the extent that they include videos of products, are typically "unalterable" (*i.e.*, non-interactive videos).  *Id.* at 1:20-25.  The '306 Patent observes that interactive videos would enhance the shopping experience by allowing customers to learn more about an item's features before purchasing.  *Id.* at 8:53-9:5.  "For example, in the context of a product on sale (e.g., a car, a shirt, gym equipment, etc.), the video featuring the product may be configured to enable a user to interact with the representation of the product, the product's features, types of the product, options for the product, accessories for the product, other products similar and/or related to the product, etc."  *Id.* at 8:53-59.

Accordingly, the '306 Patent discloses a framework by which retailers (also known as "publishers") may use to generate interactive videos and embed them into product-specific pages on their own websites.  *Id.* at 9:6-26.  The system of the '306 Patent allows a publisher to define

5

"templates" for types of products, in which each template (the structure of which is shown in Fig. 4A) includes multiple modules corresponding to video sections, and define a path that the customer can take through the interactive video. *Id.* at 10:27-64. In the example of Figure 4B, "the project 404 is for an interactive video enabling the selection of a wall paint," with video modules that "enabl[e] the selection of a room (e.g., in a residence); … a color; … a shade; … a sheen; and … the selection of a cost." *Id.* at 10:65-11:6. "In another example, a template for an interactive video featuring a fashion product (e.g., clothes, accessories, shoes, etc.) may include a first section for the user to select a fashion influencer, a second section to view a product associated with the influencer, a third section to select a color, and a fourth section to select a color." *Id.* at 11:29-34.

The inventors of the '306 Patent recognized that a retailer would look to embed the interactive video as an integral part their own product websites, to be shown adjacent to retailer provided content regarding the item, rather than a separate website to which a shopper would navigate separately. *Id.* at 9:6-23. Rather than the retailer being required to implement and host the interactive video functionality themselves, it would be preferable if the retailer could rely on a third-party automated platform to generate and embed an interactive video, such as that provided by Eko.com. *Id.* at 9:6-23, 14:65-15:10. However, the inventors recognized the problem of the prior art that, when an interactive video is "embedded into the webpage, there may be a disconnect between the content on the webpage and user interactions with the interactive video." *Id.* at 12:67-13:2. Thus, to make the experience seamless for the shopper, it would be "advantageous to integrate the interactive video into the webpage such that interactive video and/or the webpage can be dynamically updated based on the user interactions." *Id.* at 13:2-5.

To achieve the goal of embedded interactive product video while solving the "disconnect" observed in the prior art, the '306 Patent discloses a software architecture in which the interactive-

video-containing product webpage is divided into at least two distinct components: an "application layer" and a "video player layer." *Id.* at 13:6-22. The application layer may be, *e.g.*, the retailer's webpage for the product, while the video player is provided separately from a third-party such as Eko.com. *Id.* at 13:24-46, 14:65-15:10. An example of this configuration is shown in Fig. 8.



**FIG. 8**

By separating the two layers into distinct components (*e.g.*, separate HTML modules located at distinct URLs), this architecture allows the application layer content to be provided from one server (known as a "content server," *e.g.*, Amazon.com or Walmart.com) and the interactive video encoding and processing functionality of the video player layer to be provided on a separate, third-party server (known as an "application server," *e.g.*, Eko.com). *Id.* at 4:16-30, 14:65-15:10, Fig. 1. The retailer/publisher gains access to the video player layer by, *e.g.*, embedding a link to eko.com in the product webpage that is sent to the user, in which the URL for that link further includes a designation of the product and video to show. *Id.* at 14:65-15:10. The web browser on the user's device will then separately retrieve the two layers from the two servers over the network, and combine them in order to provide a single application, as shown in Figure 1. *Id.* at 13:9-22.

By embedding the interactive video player layer through a link on the retailer's website, the retailer is able to easily obtain the benefits of interactive video without having to host the interactive-video functionality directly or know any details about its implementation. Moreover,

7

the retailer may rely on the template functionality provided by Eko or other third party (as discussed above), and after embedding the video player layer into each of multiple product-specific webpages (*e.g.*, "each webpage featuring a different model of a shoe"), then "override the template with content and/or configurations specific to the item on that webpage." *Id.* at 12:45-60. Thus, the architecture of the '306 Patent allows for ease of use and flexibility.

However, because the application layer and video player layer are now distinct components, potentially provided by distinct companies, the inventors of the '306 Patent recognized that there needs to be a way for them to communicate across the "disconnect" in order to allow the interactive video to be dynamically updated based on user interactions with the product webpage. *Id.* at 12:63-13:5. The '306 Patent addresses this by having the application layer build on the JavaScript "postMessage" framework to send specific messages to the video player layer, instructing the video player to update. *Id.* at 13:56-58. For example, as shown in Figure 9, when the user specifies a size 20 white shirt in application layer user-interface elements 806a and 806b, the application layer 802 sends a first message containing this product configuration to the video player layer 804, which then displays a corresponding video 900a. *Id.* at 13:50-62.



FIG. 9

After the user subsequently edits the size in UI element 806a to 10, the application layer

sends a second message with the new configuration to the video player layer 804, which updates its display to an alternate video 900b corresponding to that new configuration. *Id.* at 13:62-14:2. The communication is bidirectional. *Id.* at 14:50-55. Thus, if the user uses the UI elements of the video player to edit the configuration (*e.g.*, changing the color from white to black), the video player layer 804 sends a third message with the new configuration back to the application layer 802, instructing it to update its UI elements accordingly. *Id.* at 14:1-14.

The independent claims of the '306 Patent are directed to this separate application layer and video player layer, with message-based communication between them. In the method of claim 1, the instrumentality "provide[s] a product webpage" (limitation [1]) and "display[s]" both "an application layer including a plurality of [UI] elements" corresponding to features (limitation [2]), as well as "a video player layer integrated in the application layer and configured to present the interactive video" about the product (limitation [3]). In response to "receiving, via a first UI element of the plurality of UI elements, a first user interaction" regarding a "a first configurable feature of the product" (limitation [4]), the application layer "send[s] at least one first message … to the video player layer" (limitation [5]), when then "present[s] … first video content" corresponding to that feature "based on" the message (limitation [6]). "[D]uring [the] presentation of the first video content," the application layer is capable of receiving a second user selection for a second feature (limitation [7]), at which point it will send a second message to the video player layer (limitation [8]), which will then "transition[] from the first video content to second video content of the interactive video based on the at least one second message" (limitation [9]).

IV.    <u>ARGUMENT</u>

    A.    **U.S. Patent No. 9,641,898 Is Directed To Patentable Subject Matter**

The '898 Patent is not directed to an abstract idea. Rather, it is directed to a specific implementation of a video player that utilizes a novel data structure known as a predefined content

path, in order to achieve specific improvements in the operation of a video player. The patent further requires implementation using a specific arrangement of other data structures, such as a watch list and video library, such that it does not claim mere functionality, nor attempt to monopolize a particular function. Moreover, the non-conclusory allegations in the complaint and the statements in the patent establish that this data structure provides a novel and patentable advancement over conventional video players.

1.    *Alice/Mayo* **Step One: The '898 Patent Is Directed To A Video Player Implementation Using Specific Data Structures**

The premise of Artisan's argument regarding the '898 Patent is that it allegedly is "directed to the abstract idea of collecting, organizing, and automatically displaying content (e.g., a playlist of videos)," or alternatively, the "idea of inserting selected videos into an existing playback sequence and then resuming that sequence." Br. at 8. But Artisan fails to engage with the actual claim language—never quoting more than a handful of words from the claim limitations—and disregards key claim elements entirely. As the Federal Circuit has warned, "[t]o disregard [] express claim elements is to proceed at 'a high level of abstraction' that is 'untethered from the claim language' and that 'overgeneraliz[es] the claim.'" *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020) (alteration in original). In fact, Artisan's characterization wildly overgeneralizes the claims, which are directed to a specific implementation of a video player that organizes and displays content using specific data structures and software components.

At *Alice/Mayo* Step One, courts "ascertain[] the 'basic character' of the claimed subject matter," for which it is particularly useful to "examine the 'focus of the claimed advance over the prior art.'" *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379 (Fed. Cir. 2024). "In doing so, [courts] must avoid describing the claims at a high level of abstraction, divorced from the claim language itself." *Id.* In identifying the point of novelty to which the claims are directed,

courts should consider what the specification describes as the advancement. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1303 (Fed. Cir. 2019) ("The specification bolsters our conclusion that the claims are directed to a technological solution to a technological problem.").

Two relevant considerations for whether a claim is non-abstract are "whether the focus of the claimed advance is on a solution to a problem specifically arising in the realm of computer networks or computers, and whether the claim is properly characterized as identifying a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function." *TecSec*, 978 F.3d at 1293 (citations omitted). Particularly relevant here, the Federal Circuit has repeatedly held that where a claim's alleged point of novelty was a specific data structure to be used in a computer application to address computing-specific problems, that claim was a non-abstract technological improvement. *See, e.g., Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908-909 (Fed. Cir. 2022) (claim that "adds an additional data field to the prior art" in order to "reduc[e] associated network delays" was "directed to a specific … data structure designed to enable technological improvements to the commissioning process"); *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307–08 (Fed. Cir. 2020) (claim that adds to prior art an "additional data field [that] enables a primary station to simultaneously send inquiry messages and poll parked secondary stations," in order to "eliminate[] or reduce[] the delay present in conventional systems," was non-abstract); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (claim directed to a "specific type of data structure designed to improve the way a computer stores and retrieves data in memory" was non-abstract).

The focus of the claimed advance of the '898 Patent is the video player's use of the novel predefined content path data structure ("a video player programmed to … present[] a video stream … comprising a predefined path of prerecorded video segments" and further comprising "decision

11

point[s] in the predefined path," *see* limitations [1], [2], [7]).  This data structure solves problems specifically arising in the realm of computer networks, including the hard, non-seamless transitions that would otherwise occur between successive video segments, and the inability to provide seamless interactive video.  '898 Patent at 1:14-26. 12:19-38.  This data structure allows the video player to provide the viewer "a complete, start-to-finish, seamless presentation" with smooth transitions and without buffering delays, *id.* at 12:25-58, as well as provide interactive videos that have imperceptible transitions between segments, *id.* at 13:22-31, among other benefits.  The '898 Patent does not merely claim the result of seamless video, it "claims a particular improvement in *how* this is done," namely by using the predefined content path.  *Cf. Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 897 (Fed. Cir. 2019) (emphasis in original) (despite that "the goal of the claims is functional," finding claims patentable for claiming a means to achieve that goal).

Beyond the use of the predefined content path, the claims of the '898 Patent recite implementation details that are "'additional features' that ensure the claims are 'more than a drafting effort designed to monopolize [an] abstract idea.'"  *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014) (brackets omitted).  These include additional data structures and software components, as well as a particular series of user interactions that must be performed in order to meet the claims.  The Federal Circuit has found claims non-abstract where, like here, "they had the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it."  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018).  Here, the claims are limited to video players that include specific elements, including "a library of selectable prerecorded video segments" that are "display[ed] to the user" (limitation [4]) and can be selected by the user (limitation [5]), at which point the segments are "add[ed] … to a video segment watch list" (limitation [6]).  It is specifically user-selected segments on the watch-list (as

opposed to computer-identified segments) that are inserted into the video stream at decision points along the predetermined path and displayed (limitations [7]-[9]).  The '898 Patent thus does not claim all video players that achieve a result, but only one that meets these specific steps.

Artisan's reliance on this Court's decision in *Robocast, Inc. v. Netflix, Inc.*, 767 F. Supp. 3d 138, 141 (D. Del. 2025) is misplaced.  The claims there at issue recited only functional tasks related to "generating a playlist of content, accessing content … , organizing and displaying content …, or permitting the user to adjust the duration of the display of content," but lacked "any specificity as to how to accomplish [these] tasks." *Id.* at 141-42.  Likewise, the claims at issue in *Bluebonnet Internet Media Servs., LLC v. Pandora Media, LLC*, No. 2022-2215, 2024 WL 1338940, at *1 (Fed. Cir. Mar. 29, 2024), recited "an internet enabled multimedia computing platform" that received song ratings and "automatically and dynamically generate at least one play-list based on rating information," without specificity as to how the playlists were generated.  By contrast, the claims of the '898 Patent specify how to accomplish the task of presenting interactive video through use of specific, novel data structures and other steps.

### 2.    *Alice/Mayo* Step Two: The Non-conclusory Allegations of the Complaint Establish That '898 Patent Contains An Inventive Concept

Even assuming Artisan's contention (Br. at 8) that the claims of the '898 Patent are directed to the abstract idea "of inserting selected videos into an existing playback sequence and then resuming that sequence" (and they are not), the motion must be denied at *Alice/Mayo* Step Two because the complaint and patent raise concrete, non-conclusory allegations that the claims accomplish this by doing more than the performance of routine and conventional activity.

"[T]he second step of the Alice/Mayo test is satisfied when the claim limitations 'involve more than performance of "well-understood, routine, [and] conventional activities previously known to the industry."'" *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121,

1128 (Fed. Cir. 2018).  Whether or not a claim is directed to routine and conventional activity is a factual issue, which on a motion to dismiss must be resolved in favor of the patentee when "[t]here are concrete allegations in the … complaint that individual elements and the claimed combination are not well-understood, routine, or conventional activity," or when there are "concrete allegations regarding the claimed combination's improvement to the functioning of the computer." *Id.* at 1128; *see also, e.g.*, *Weisner v. Google LLC*, 51 F.4th 1073, 1087 (Fed. Cir. 2022) (although finding claims abstract in step one, nonetheless reversing dismissal at step two based on complaint's allegations that claimed "implementation is alleged … to be an inventive concept that improves computerized search results by taking into account [certain information]," which complaint "contrasted against the conventional method of prioritizing searches").

Here, the complaint and the patent allege that the use of the "predefined path" data structure was a novel advancement that "improves the functioning of the video player itself by enabling real-time modification of a video stream's playback path while preserving the technical requirement of seamless playback." Compl. ¶18.  The '898 Patent enables this advancement "[b]y identifying decision points in a predefined path and inserting user-selected segments at those points," thus "avoid[ing] the buffering delays, playback stoppages, and context switching that characterized prior systems." *Id.*  Furthermore, "[t]he architecture described in the '898 Patent," which includes the use of the predetermined content path, "enables instantaneous transitions through sophisticated pre-buffering and content delivery mechanisms." *Id.* ¶16.  This is contrasted with the prior art approach, which did not use predetermined content paths, but instead used traditional linear video.  *Id.* ¶¶2-3.  These are concrete allegations regarding the novelty of the claimed invention, such that the motion to dismiss must be denied.

**B.    U.S. Patent No. 12,450,306 Is Directed To Patentable Subject Matter**

The claims of the '306 Patent are not directed to an abstract idea.  Rather, they are directed

to a specific software architecture that allows straightforward integration of interactive video in a retailer's product sales pages, in a way that overcomes the prior-art problem of a "disconnect between the content on the webpage and user interactions with the interactive video," but instead allows both the interactive video and webpage to be dynamically updated based on a user's interactions with either. '306 Patent at 12:67-13:5. The result is a fully synchronized, dynamically responsive product presentation experience in which the video and the surrounding webpage behave as a unified, coherent system rather than as independent components. Moreover, the non-conclusory allegations in the complaint and the statements in the patent establish that this software architecture provides a novel and patentable advancement over conventional video players.

### 1. *Alice/Mayo* Step One: The '306 Patent Is Directed To A Video Player Implementation Using A Specific Software Architecture

The premise of Artisan's argument regarding the '306 Patent is that the claims are directed to the allegedly abstract idea "of showing a video on a webpage for a product, where the video is updated to show the product options that a user selects." Br. at 12. But Artisan "describe[es] the claims at a high level of abstraction, divorced from the claim language itself." *Contour*, 113 F.4th at 1379. Although part of the intended result of using the '306 Patent's claimed system is to display interactive video based on user selections, Artisan ignores the actual claim language that recites *how* this result is accomplished, rather than claiming the result itself.

Specifically, the '306 Patent's claims recite that in order to "provid[e] a product webpage" (limitation [1]), the accused system must provide the user with (at least) two distinct components that are communicatively coupled to one another through a message passing interface: (1) "an application layer including a plurality of user interface (UI) elements" (limitation [2]) and (2) "a video player layer integrated in the application layer and configured to present the interactive video to the user" (limitation [3]). The application layer limitation is more than any set of "user interface

15

elements for selecting product options" (as Artisan contends, Br. at 12).  Although the application layer "include[es] a plurality of user interface (UI) elements," the application layer *also* contains software capable of "sending at least one first [and second] message … to the video player layer" (limitations [5] & [8]) in response to receiving a first and second user interactions from those UI elements (limitations [4] and [7]).  The structure of the claim implies that the messages are more than just any "prior-art JavaScript postMessage" (as Artisan contends, Br. at 13), but instead are specially formatted messages that build on the JavaScript postMessage API to carry or otherwise indicate "a user-specific product configuration having the first [or second] feature configured with the first [or second] feature option."  This follows from the fact that the "video player layer" is not merely any "prior-art embedded video player" (as Artisan contends, Br. at 12), but *also* contains software capable of receiving and interpreting the first and second messages, and then "based on the at least one first [or second] message," presenting "video content" having the first and second features configured according to the content of the messages (limitations [6] & [9]).

There is no basis to conclude (as Artisan contends), that the specific application layer, video player layer, and messages recited in the claim are prior art.  To the contrary, the '306 Patent distinguishes its message-passing configuration from the prior art, explaining that prior art exhibits a "disconnect" between webpage and video player, and that by using the specific message-passing framework the disclosed system is able to overcome these deficiencies and instead provide seamless integration.  '306 Patent at 12:67-12:2, 14:50-65, 15:11-49.

Artisan attempts to analogize the system of the '306 Patent to the ordinary business scenario where "a store clerk in a retail store" presents a customer with a sample when they ask to see a shirt.  Br. at 13.  But claims directed to solving common "business challenge[s]" are non-abstract when "the claimed solution is necessarily rooted in computer technology in order to overcome a

16

problem specifically arising in the realm of computer networks." *DDR Holdings*, 773 F.3d at 1257. Such is the case here. A brick-and-mortar store clerk is not faced with the challenge of overcoming "a disconnect between the content on the webpage and user interactions with the interactive video." '306 Patent at 12:67-13:2. That is an Internet-specific problem, which the '306 Patent solves by the technological solution of a message-passing architecture between application layer and video player layer.[1]

### 2.   *Alice/Mayo* Step Two: The Non-conclusory Allegations of the Complaint Establish That '306 Patent Contains An Inventive Concept

Artisan's analysis for Step Two is based on little more on the conclusory statement that "[t]he claims add nothing beyond the abstract idea itself: the ability to select options for a product on a web page and have the video on the page reflect those choices." Artisan does not engage with the actual claim language, beyond stating that "[t]he specification of the '306 patent recognizes that all of the basic elements of the patent existed in the prior art—the 'application layer' (UI elements on a web page), the 'video player layer' (an embedded video player), and the messages passed between them (via, e.g., a Javascript API)." Br. at 14. But this statement is incorrect. As discussed in the previous section, Artisan's characterization oversimplifies the claimed application layer, video player layer, and messages. Although these claim elements build on prior art concepts, they are configured in a way that was not conventional in the prior art. By contrast, the patent explains that when using the prior art components, "there may be a disconnect between the content on the webpage and the user interactions with the interactive video." '306 Patent at 12:67-13:2. The '306 Patent explains that it solves this issue by using the novel message-passing structure of

---

[1] By contrast, the case on which Artisan relies for the "store clerk" holding involves claims that provided no technological solution to a computer-specific problem, but instead recited only "steps [that] could be performed by humans, or on pen and paper." *Innovaport LLC v. Target Corp.*, No. 2024-1545, 2026 WL 321266, at *4 (Fed. Cir. Feb. 6, 2026).

the claims. *Id.* at 14:50-65, 15:11-49. Because the complaint and patent sufficiently raise allegations that this structure is not routine and conventional, the motion must be denied.

### C.    The Complaint Provides Sufficient Notice of Infringement For Both Patents

The Complaint meets the low bar of providing sufficient notice to Artisan that Eko accuses Artisan's interactive video functionality of infringing both the '898 and '306 Patents. "A plaintiff is not required to plead infringement on an element-by-element basis…. Instead, it is enough that a complaint place the alleged infringer on notice of what activity is being accused of infringement." *Bot M8*, 4 F.4th at 1352 (cleaned up). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the ground upon which it rests.'" *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018). The facts of *Disc Disease* are particularly informative. In that case, the Federal Circuit held that a complaint that merely "identified the three accused products—by name and by attaching photos of the product packaging as exhibits—and alleged that the accused products meet 'each and every element of at least one claim'" was "enough to provide [defendant] fair notice of infringement." *Id.* at 1260.

The allegations in the Complaint far exceed those in *Disc Disease.* Not only does the Complaint include photographs of examples of the accused functionality, and identify them by their specific URL, but also provides charts with a detailed analysis as to ***how*** they meet (or are believed to meet) each element. The charts make clear how Artisan allows for the type of dynamic user interaction with the videos that are claimed in the patents-in-suit. Artisan attempts to nitpick individual elements, claiming that the Complaint fails to show exactly how each element is met. But again, this is not required by the law. *See Bot M8*, 4 F.4th at 1352.

In any event, Artisan's criticisms are unavailing. For the '898 Patent, Artisan faults the Complaint on the basis that "the screenshot and linked videos show neither a playlist nor any 'watchlist.'" Br. at 16. But the claims do not require a "playlist," nor "show[ing] … any 'watchlist.'"

18

The Complaint adequately alleges that this limitation is met because "[u]pon information and belief, once the user makes her selection, the Accused Products add the chosen video to a video watch list or queue." Compl. Ex. C at 68. The Complaint further includes "screenshots [that] show the video selected by the user [*i.e.*, the video added to the watchlist] playing after the transition," which implies that the video was taken from the watchlist in order to transition to it. *Id.* at 68-69. Artisan further contends that the Complaint provides no evidence of the "predefined path of prerecorded video segments" (Br. at 16). But in fact, the Complaint identifies the interactive video streams at issue by showing screenshots, and explains that "[u]pon information and belief, the video stream includes multiple prerecorded video segments." Compl. Ex. C at 56. Artisan may dispute whether its interactive video functionality in fact meets this limitation, but there is no dispute that Artisan has been placed on notice that this aspect of its interactive video functionality is accused of infringement, which is all that is required.

Similarly, for the '898 Patent, the Complaint shows how Artisan's interactive video functionality meets the limitation of "selection of a first feature option" and presenting video corresponding video content, by selecting buttons (annotated in the figures) that cause transitions to feature-specific videos. Compl. Ex. D at 97-101. Artisan may dispute the merits of this allegation, but again, is squarely placed on notice of Eko's allegations of infringement.

Finally, although Eko maintains that its allegations are sufficient, to the extent that the Court disagrees and grants this aspect of the motion, Eko respectfully requests that the dismissal be without prejudice, with leave to amend to plead additional factual detail.

### D.    The Complaint Plausibly Pleads Pre-Suit Knowledge of Infringement

The Complaint sufficiently alleges that Artisan had pre-suit knowledge of the patents and its infringement to survive a motion to dismiss. In the context of the Patent Act, "knowledge" encompasses willful blindness to the existence of a patent. *Global-Tech*, 563 U.S. at 768. In

19

*Global-Tech*, the Supreme Court held that when a competitor knowingly copied the patentee's fryer—despite no conclusive evidence that the competitor knew of the patentee's patents covering that fryer—this and related facts were sufficient evidence to allow for a finding of willful blindness to the fact that the fryer was patented. *Id.* at 771.

Similarly here, the Complaint alleges that Eko contracted Artisan "to provide video production services, including for videos using the technology claimed in the Asserted Patents" (Compl. ¶32), and that "[o]ver the course of a multi-year commercial relationship between the parties, Artisan became well acquainted with eko's patented technology and its commercial benefits" (Compl. ¶4). However, after that relationship ended, "Artisan copied eko's technology, deploying infringing e-commerce products and production services for itself and its customers." *Id.* The Complaint further explains that "[p]rior to and during the parties' contractual relationship, Artisan marketed only traditional photography and linear videography services," but subsequently "has begun promoting services in 'interactive' e-commerce video creation" in a way that infringes the Asserted Patents. Compl. ¶33. From these facts, it is reasonable to infer that Artisan learned of the patented technology and its benefits during its work with Eko, and after that relationship ended, decided to use what it learned about the patented technology to enhance its own product. It is further reasonable to infer that Artisan learned of the patent itself, or at a minimum, was willfully blind to the fact that Eko's novel technology was patented, such that copying that technology would be an act of infringement.

Finally, although Eko maintains that its allegations are sufficient, to the extent that the Court disagrees and grants this aspect of the motion, Eko respectfully requests that the dismissal be without prejudice, with leave to amend to plead additional factual detail.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Andrew D. Gish
Michael M. Powell
Christopher DeCoro
Joel C. Lin
GISH PLLC
41 Madison Avenue
New York, NY 10010
Tel:  (212) 518-2000

Ryan K. Iwahashi
GISH PLLC
50 California Street
San Francisco, CA 94111
Tel:  (415) 630-2000

Dated: March 5, 2026

By:  */s/ David E. Moore*
  David E. Moore (#3983)
  Bindu A. Palapura (#5370)
  Andrew M. Moshos (#6685)
  Chamyra L. Upshur (#7344)
  Hercules Plaza, 6th Floor
  1313 N. Market Street
  Wilmington, DE  19801
  Tel:  (302) 984-6000
  dmoore@potteranderson.com
  bpalapura@potteranderson.com
  amoshos@potteranderson.com
  cupshur@potteranderson.com

*Attorneys for Plaintiff JBF Interlude 2009 Ltd.*